**Patrick Joseph TURNER, et al.**

v.

**MURPHY OIL USA, INC.**

**This Document Relates To All Cases.**

**Civil Action No. 05–4206.**

United States District Court,
E.D. Louisiana.

Oct. 6, 2008.

### ORDER AND REASONS

ELDON E. FALLON, District Judge.

Before the Court is Special Master Judge Robert Klees' Final Report regarding the allocation of the common benefit fee award among plaintiffs' counsel (Rec. Doc. No. 2457) as well as Objections to the Special Master's Final Report from Salvador Gutierrez (Rec. Doc. 2477), Anthony Irpino (Rec. Doc. 2480), Daniel Becnel (Rec. Doc. 2481), Jerald Andry (Rec. Doc. 2483); Sidney Torres (Rec. Doc. 2485), Val P. Exnicios (Rec. Doc. 2486), Mickey Landry (Rec. Doc. 2487), Lance Licciardi (Rec. Doc. 2488), Michael Stag (Rec. Doc. 2489),

and a Request to Clarify and Correct Factual Errors in Certain Objections to the Special Master's Report (Rec. Doc. 2484). The Court previously awarded $33,746,241.88 in common benefit fees and costs and allowed the plaintiffs' attorneys an opportunity to make a recommendation to the Court as to the appropriate allocation of this sum. The attorneys were unable to agree upon the appropriate allocation, and the Court appointed a special master to consider this issue and make a recommendation for the Court's consideration. After considerable discovery, several hearings and a preliminary report, the Special Master has now submitted his final report to the Court. This report was sent to all counsel of record and has been posted on the Court's website. Counsel were accorded an appropriate period to file objections with the Court, and be heard. The Court has now had an opportunity to consider the matter and issues the following Order and Reasons.

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. Factual Background[1]

To put this matter in context, a brief summary of the events is helpful. On August 29, 2005, Hurricane Katrina made landfall on the Louisiana/Mississippi border, resulting in one of the most devastating natural disasters ever to occur in the United States. As the storm passed over southeastern Louisiana, twenty-foot storm surges rolled into the Mississippi River–Gulf Outlet (the "MR–GO") and swept over and breached some fourteen miles of a levee system intended to protect St. Bernard Parish, inundating nearly all of the homes and businesses with massive flood waters.

---

1. For a more detailed discussion of the factual and procedural background of this litigation, *see Turner v. Murphy Oil USA, Inc.,* 234 F.R.D. 597 (E.D.La.2006) (certifying case as a class action), *and Turner v. Murphy Oil USA, Inc.,* 472 F.Supp.2d 830 (E.D.La.2007) (approving settlement agreement).

Among those properties impacted by the flood waters was the Murphy Oil refinery in Meraux, Louisiana. The refinery, owned and operated by Murphy Oil USA Inc., produced approximately 125,000 barrels of refined petroleum per day. Located on Murphy's property are multiple above-ground tanks used to hold crude oil. These tanks are surrounded by earthen berms, or dikes, built to contain any oil that might escape from the tanks in the event of a leak or spill. These containment devices either failed or were topped and flood waters encircled the tanks. One of the tanks allegedly had an insufficient amount of product in it to keep it anchored. It floated and broke from its moorings and ruptured allowing approximately 25,110 barrels of crude oil to escape and travel into the neighborhoods surrounding the refinery. Numerous lawsuits soon followed.

After some initial discovery, motions were filed seeking class certification. Following an evidentiary hearing and extensive briefing the Court certified this matter as a class action. *See, Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D.La.2006) (certifying class action). On March 3, 2006, the Court adopted a trial plan for this litigation, which bifurcated the trial into two different phases.[2] Phase One would address common issues of liability and general causation; Phase Two would consist of successive trials on specific causation and compensatory damages. However, Phase Two would only take place if a jury found Murphy liable in whole or in part in Phase One.

Phase One of the trial was scheduled to commence on October 2, 2006. However,

on September 25, 2006, the trial was cancelled because the parties reported to the Court that they had come to an amicable resolution of the case and had signed a Memorandum of Understanding to this effect.[3] On October 9, 2006, the parties presented a Final Settlement Agreement and Notice Program to the Court,[4] which was preliminarily approved on October 10, 2006,[5] pending a fairness hearing noticed to all class members. The total amount of the settlement was $330,126,000. In addition, Murphy also agreed to pay all reasonable common benefit fees and costs to be determined by the Court. *See Turner v. Murphy Oil USA Inc.*, 472 F.Supp.2d 830, 845 (E.D.La.2007).

## B. Settlement Agreement and Determination of Common Benefit Fund

A fairness hearing was held on January 4, 2007, and the matter was taken under submission by the Court at that time.[6] On January 30, 2007, the Court approved the Class Action Settlement of $330,126,000 and awarded an additional sum for common benefit fees and expenses. *Turner v. Murphy Oil, USA, Inc.*, 472 F.Supp.2d 830 (E.D.La.2007). In order to determine the amount of the common benefit fund it was first necessary to decide what portion of the settlement was produced by plaintiffs counsel's efforts. The Court concluded that the portion of the settlement amount recovered as a result of their efforts was $195,000,000. *Id.* at 861–62. The Court reached this figure by excluding from the computation the sum of $83,264,000 paid by Murphy in its voluntary settlement program established before suit was filed and $51,862,000 in pre-class settlement remedi-

---

2.  *See* Rec. Doc. No. 257.

3.  *See* Rec. Doc. No. 588.

4.  *See* Rec. Doc. No. 742.

5.  *See* Rec. Doc. No. 731.

6.  *See* Rec. Doc. No. 1042.

ation costs. *Id.* These amounts were excluded from the computation of the common benefit fund because they were not produced by plaintiffs' counsel's efforts. The Court then evaluated the benefit received by the class from these efforts and found that an initial benchmark of 15% of the amount recovered by counsel's efforts, would produce a reasonable common benefit fund in this case. *Id.* at 862–64. Next, the Court considered the various *Johnson* factors to determine whether an adjustment of the initial benchmark was warranted. *Id.* at 864–67. After a review of these factors, the Court found that an upward adjustment of the benchmark percentage was appropriate and the Court increased the percentage to 17%.[7] *Id.* Based on these determinations, this analysis suggested that the PSC was entitled to common benefit fees and costs of 17% of $195,000,000 plus some previously escrowed funds for a total of $33,746,241.88. *Id.* at 867. The Court then performed a lodestar cross-check. *Id.* at 867–69. After its review, the Court determined that the lodestar cross-check supported an award of $33,746,241.88. *Id.* at 869. Accordingly, the Court awarded such amounts as common benefit fees. *Id.* Pursuant to the terms of the settlement agreement the Court ordered that the common benefit fund was to be paid by Murphy in addition to the amounts to be paid to the plaintiffs.

*Id.* at 856–71. That is to say, the common benefit fund was not created by deducting money from the plaintiffs' funds. It was a separate fund to be set by the Court and to be paid by Murphy in addition to the amounts paid to the plaintiffs. Murphy, in satisfaction of its obligations, proceeded to pay the plaintiffs the amounts agreed upon and then deposited the common benefit funds into the registry of the Court to be distributed to the plaintiffs' attorneys at a later date. (the "Common Benefit Fund").

The Plaintiffs have now received their funds and all that is left is the distribution of the Common Benefit Fund among the plaintiffs' attorneys.

## C. Plaintiffs' Counsels' Initial Attempt at Allocating the Common Benefit Fund

Initially, the Court left it up to the PSC attorneys to make a recommendation of the appropriate distribution of these funds. *Id.* at 869–70. The Court asked Sidney Torres, the Plaintiffs' Liaison Counsel, to try and achieve a unanimous agreement as to how the Common Benefit Fund should be allocated among counsel. The Court felt that this approach was prudent due to the unique circumstances of this case. First, because of the relatively low number of attorneys involved in the case, the Court felt that unanimity was possible.[8] Second,

---

7. Specifically, the Court found that the following *Johnson* factors warranted an upward enhancement: (1) the time and labor required; (2) time limitations imposed by the client or the circumstances; (3) the preclusion of other employment by the attorney due to the acceptance of the case; (4) the novelty and difficulty of the questions; (5) the skill requisite to perform the legal service; (6) the "undesirability" of the case; (7) the amounts involved and the results obtained; and (8) the experience, reputation, and ability of the attorneys. *Turner*, 472 F.Supp.2d at 865.

8. Based on the Court's experience, in collective actions, such as class actions and multi-

district litigations, the number of attorneys seeking a portion of a common benefit fund is typically large such that achieving unanimity among counsel is impossible even in concept. In those situations the prudent approach would be for the Court to appoint a committee to collect evidence and make a recommendation to the Court. The Fifth Circuit has approved of the appointment of such a fee committee. However, when a fee committee is appointed, the Court must maintain close supervision of the committee and "closely scrutinize" any recommendation from the committee. *In re High Sulfur Content Gasoline Products Liab. Litig.*, 517 F.3d 220, 235 (5th Cir.2008). This is so because there are

the Court has been actively involved with this litigation from its inception and based on the Court's observation on how counsel interacted with each other over the course of the litigation the Court felt that this approach could be successful. However, after six weeks of attempting to reach consensus, the attorneys were unable to agree on a proposed allocation.[9]

### D. The Appointment of the Special Master and his Procedure

Because counsel were unable to reach an agreement, the Court appointed Judge Robert Klees (Ret.) as Special Master and Mr. Dominic J. Gianna as Counsel to the Special Master to assist the Court with the apportionment of the award.[10] These individuals are exceptionally qualified by education and experience to carry out the duties of these positions.

Judge Klees holds an LL.B. degree from Loyola University School of Law and an LL.M. from the University of Virginia. Judge Klees served as an Assistant District Attorney for Plaquemines and St. Bernard Parish from 1972 through 1978, and was elected to the Police Jury in St. Bernard Parish is 1980. In 1981, Judge Klees was first elected to the Louisiana Fourth Circuit Court of Appeals, where he served with distinction and became Chief Judge in February of 1999. Judge Klees was also an instructor in business law at Dominic College and taught trial advocacy as a member of the Adjunct Faculty at Tulane University School of Law. Currently, Judge Klees teaches trial advocacy at the Paul M. Hebert Law Center at the Louisiana State University.

Dominic Gianna holds a B.S. degree in chemistry from Manhattan College, an M.S. degree in organic chemistry from the State University of New York–Buffalo, and a J.D. from the Loyola University School of Law. While in law school, Mr. Gianna served as the Editor–in–Chief of the Loyola Law Review. Mr. Gianna is also a founding member of the law firm of Middleberg, Riddle & Gianna, and he has tried cases throughout the United States for thirty-four years. Since 1995, he has been appointed as Special Master in numerous class actions and complex cases. He has sat as a state court judge *pro tem*, was Chair of the Civil Law Section of the Louisiana State Bar Association and was selected as Program Chair of the American Bar Association Section of Litigation Annual Meeting. Mr. Gianna is a frequent lecturer on the topics of advocacy and trial techniques. Currently, Mr. Gianna is a fellow of the International Society of Barristers, and is a Regional Director and member of the National Faculty of the National Institute for Trial Advocacy.

---

conflicts of interest inherent in appointing a fee committee: the members of the committee suggest to the court a division of a limited fund among themselves and other firms. *In re High Sulfur Content*, 517 F.3d at 235 (citing *In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143, 173 (3d Cir.2005) (Ambro, J., concurring)).

9. This, while disappointing, is understandable. The PSC was dealing with a limited pot of funds and any allocation plan was a zero sum game. For every dollar counsel A would receive, that was one less dollar available for counsel B, C, D and so on. As a result, in order to substantiate and improve the amount allocated, counsel would necessarily have to denigrate and undermine the efforts of other counsel seeking part of the Common Benefit Fund. Further, sometimes once the "common enemy," in this case Murphy, is removed, plaintiffs' counsel have a difficult time coming to any kind of agreement and they begin to turn on each other.

10. *See* Rec. Doc. No. 1501. Further, the Court previously appointed Judge Klees as Special Master in this litigation to perform certain delineated functions pursuant to the Settlement Agreement. Rec. Doc. No. 898.

On May 14, 2007 Judge Klees met with the attorneys who claimed a portion of the common benefit fund and discussed the various factors that he planned to take into account when allocating the common benefit fund and invited their input. Then on May 22, 2007, Judge Klees, after factoring in the attorney input, issued his Case Management Order which set forth the procedures for attorneys claiming entitlement to a portion of the Common Benefit Fund. (Rec.Doc. No. 1667).

Under the Case Management Order, such counsel had to submit an affidavit to the Special Master and counsel for the Special Master setting forth the common benefit work for which counsel seeks compensation (the "Common Benefit Affidavit"). The Common Benefit Affidavit was limited to ten double spaced pages and the applicant was to include a list of the services performed for the common benefit of the class, a description of the services performed, the number of hours spent on such common benefit service, the number of cases the applicant contributed to the class action, and any other facts that would qualify the applicant for a portion of the Common Benefit Fund. In total, the Special Master received 46 Common Benefit Affidavits, claiming 40,009 hours. These Common Benefit Affidavits were served on all counsel of record.

Following the service of the Common Benefit Affidavits, other counsel had thirty days to file any challenge to any Common Benefit Affidavit (the "Challenge Affidavits"). The Challenge Affidavits were required to state the substance and specific grounds for the challenge and the specific facts upon which the challenge is made. Such Challenge Affidavits were limited to five double spaced pages. In total, the Special Master received 4 Challenge Affidavits.

After the service of the Challenge Affidavits, all counsel had five days to serve written discovery upon their fellow applicants. Such written discovery was limited to five written interrogatories (including sub-parts) and two requests for production of documents. Counsel were to serve the Special Master and counsel to the Special Master with all requests for written discovery. Written discovery was to be answered within fourteen days of service of such discovery.

During the course of the written discovery phase, Joseph Bruno filed his Motion for an Order Confirming the Scope of Allowable Discovery of Attorneys Seeking Common Benefit Fees and Costs.[11] By this motion, Mr. Bruno asked the Court to enter an order stating that all discovery in this matter should be limited to that which will justify an individual's fee application and not to discredit the work and effort performed by other applicants. Val Exnicios filed a response to Mr. Bruno's motion.[12] Mr. Exnicios argued that the order that Mr. Bruno sought would essentially alter the terms of the Special Master's Case Management Order which, by its own terms, could not be altered. Also, Mr. Exnicios argued that the order sought by Mr. Bruno would limit the Special Master's ability to carry out the tasks assigned to him by the Court. The Court denied Mr. Bruno's motion stating that Special Master Klees' Case Management Order makes clear the appropriate scope of discovery and, if any applicant has a specific objection to a particular interrogatory or deposition questions, such objections should be directed to the Special Master.[13]

11. *See* Rec. Doc. No. 2000.

12. *See* Rec. Doc. No. 2038.

13. *See* Rec. Doc. No. 2050.

Also pursuant to the Case Management Order, within five days of the completion of written discovery, any applicant could request a deposition by letter to the Special Master; formal notice was not necessary. Depositions were limited to one deposition of each applicant but all interested parties could participate. The Special Master or counsel to the Special Master would attend each deposition and were permitted to ask questions during any deposition. The law firm of Landry & Swarr requested the deposition of Dennis McCartney of Bourgeois Bennet; Hugh Lambert requested the deposition of Kerry Miller, the Defendant's Liaison Counsel; Wiley Beevers and the firm of Beevers & Beevers requested the deposition of Sean Alfortish and Madro Bandaries; Michael Stag requested the depositions of Jerald Andry, Salvador Gutierrez, Dawn Barrios, Hugh Lambert, Daniel Becnel, Ronnie Penton, Scott Bickford, Sidney Torres, Joseph Bruno, Diane Zink, Roberta Burns, Walter Leger, Sean Alfortish, Jonathan Andry, Michael Hingle, Jessie Wimberly, Madro Bandaries, Rebecca Cunard, Mark Glago, Walter Dumas, Greg DiLeo; Val Exnicios requested the depositions of Sidney Torres, Gerald Meunier and Joseph Bruno. The Special Master also scheduled depositions of Jerald Andry, Jonathan Andry, Madro Bandaries, Wiley Beevers, Benjamin Beychock, Keith Couture, Val Exnicios, Scott Galante, Salvador Gutierrez, Anthony Irpino, Hugh Lambert, Mickey Landry, Lance Licciardi, E. Carroll Rogers, Michael Stag and Diane Zink.

Before these depositions were scheduled, many of the Plaintiff's counsel withdrew their requests for depositions. In total, twenty-two depositions were taken.

### E. The Special Master's Preliminary Report

After the Special Master provided the applicants the opportunity to develop the factual record, the Special Master prepared his Preliminary Report. On April 11, 2008, Special Master Klees delivered to the Court a copy of his Preliminary Report. The Court published the Preliminary Report in the record of this proceeding as well as on the Court's website dedicated to this litigation.[14] In his Preliminary Report, the Special Master made the following allocation of attorneys' fees:

| Attorney | Fee Awarded |
| --- | --- |
| Sidney D. Torres, III | $4,730,000 |
| Gerald E. Meunier | $2,910,000 |
| Hugh P. Lambert | $2,700,000 |
| Joseph M. Bruno | $2,520,000 |
| Jerald N. Andry, Jr. | $1,920,000 |
| Mickey P. Landry | $1,840,000 |
| Salvador E. Gutierrez, Jr. | $1,770,000 |
| Scott R. Bickford | $1,590,000 |
| Ronnie G. Penton | $1,523,000 |
| Daniel E. Becnel, Jr. | $1,220,000 |
| Richard J. Arsenault | $ 950,000 |
| Anthony D. Irpino | $ 680,000 |
| Robert M. Becnel | $ 600,000 |
| E. Carroll Rogers | $ 580,000 |
| Val P. Exnicios | $ 558,000 |
| Walter J. Leger, Jr. | $ 525,000 |
| Michael G. Stag | $ 400,000 |
| Darleen M. Jacobs | $ 375,000 |
| Conrad S.P. Williams, III | $ 350,000 |
| Diane K. Zink | $ 310,000 |
| Gregory P. DiLeo | $ 300,000 |
| Dawn M. Barrios | $ 258,750 |
| Madro Bandaries | $ 223,650 |
| J. Van Robichaux, Jr. | $ 165,000 |
| Mark P. Glago | $ 162,750 |
| Jessie L. Wimberly, IV | $ 116,000 |
| Rebecca A. Cunard | $ 113,050 |
| William E. Bradley | $ 108,500 |
| Benjamin D. Beychock | $ 103,950 |
| Walter C. Dumas | $ 84,000 |
| Bruce C. Betzer | $ 67,500 |

Pursuant to the Special Master's Case Management Order, the Common Benefit Fund applicants had ten days from the

---

**14.** *See* Rec. Doc. No. 2260. The Court's website is located at http://www.laed.uscourts. gov/MurphyOil.

publication of the Preliminary Report to serve objections to the Preliminary Report on the Special Master and counsel to the Special Master. In total, the Special Master received 13 objections.

After the Court published the Special Master's Preliminary Report, Michael G. Stag filed several motions with the Court. Mr. Stag filed the following motions: Emergency Motion to Clarify Due Date of Objections to Special Master's Report,[15] Motion to Expedite Emergency Motion to Clarify Due Date of Objections to Special Master's Report,[16] Motion for Extension of Time to File Objections to Special Master's Preliminary Report,[17] and Motion to Expedite Motion for Extension of Time to File Objections to Special Master's Preliminary Report.[18] The Court dismissed or denied all of Mr. Stag's motions holding that all of his motions was inappropriately filed with the Court.[19] These motions sought to clarify and amend the deadlines established by Special Master Klees' Case Management Order, and the Court held that Mr. Stag's requests should have been directed to Special Master Klees and his counsel and not directed to the Court.

Mr. Stag also filed his Motion to Make Documents Reviewed or Prepared by or for Special Master Part of the Record of These Proceedings and to Allow Stag and Other Applicants Unrestricted Access to Said Records[20] and Motion to Expedite Motion to Make Documents Reviewed or Prepared by or for Special Master Part of the Record of These Proceedings and to Allow Stag and Other Applicants Unre-

stricted Access to Said Records.[21] The Court also denied these motions stating that all of the documents Special Master Klees relied on in preparing his Preliminary Report would be made a part of the record in this case when Special Master Klees submits his final report.[22]

On May 13, 2008, Michael Stag moved to Amend or Correct the Court's Order dated April 29, 2008, and sought an Order to certify the issue for interlocutory appeal.[23] Mr. Stag argued that he should be allowed to seek an interlocutory appeal because under the Fifth Circuit's decision in *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (5th Cir. 2008) all documents used to assist in determining a fee allocation should be part of the record and subject to unrestricted review and he sought an appeal of the Court's Order stating that this will be done after the Special Master's Final Report. Further, Mr. Stag moved the Court to stay the proceedings pending his appeal.

The Court denied Mr. Stag's motion.[24] In its Order and Reasons, the Court stated that the Fifth Circuit's holding in *In re High Sulfur* requires that when a court determines the appropriate allocation of attorneys' fees, there must be a fair and transparent process in place that is also subject to appropriate judicial oversight. The Court held that the Special Master's process was detailed and transparent and would be subject to judicial oversight.

15. *See* Rec. Doc. No. 2267.

16. *See* Rec. Doc. No. 2269.

17. *See* Rec. Doc. No. 2303.

18. *See* Rec. Doc. No. 2304.

19. *See* Rec. Doc. Nos. 2277 and 2313.

20. *See* Rec. Doc. No. 2301.

21. *See* Rec. Doc. No. 2302.

22. *See* Rec. Doc. No. 2313.

23. *See* Rec. Doc. No. 2342. Mr. Stag also sought to have his motion heard on an expedited basis and requested oral argument. *See,* Rec. Doc. Nos. 2343 and 2344.

24. *See* Rec. Doc. No. 2373.

### F. The Special Master's Hearing on Objections to His Preliminary Report

The Case Management Order further provided that after the applicants submitted their objections to the Preliminary Report, the Special Master would hold a hearing to consider the objections. Special Master Klees held a hearing on May 22 and 23, 2008, regarding the objections he received to his Preliminary Report. Several applicants filed into the record either witness lists or their notice of intent to participate in the Special Master's hearing.[25]

As counsel filed their witness lists and notices of intent to participate in the Special Master's hearing, it became clear to Special Master Klees that absent a reasonable limitation on Plaintiffs' counsels' ability to argue and call witnesses, that his hearing would become unmanageable. Accordingly, Special Master Klees issued an Order addressing the structure and limitations placed on counsel at the hearing (the "Hearing Order").[26] Special Master Klees limited counsel to calling only two witnesses (including the applicant himself or herself) and fifteen minutes of direct examination, in either narrative or question and answer format. Further, counsel were limited to one cross-examination and such cross-examination was limited to ten minutes. Counsel was provided five minutes of closing argument at the conclusion of all of the testimony. Special Master Klees also ordered that all expert testimony would be introduced by written report only, and such reports were limited to four double-spaced pages in length. Applicants were allowed to submit a response to any expert reports, and such response was limited to three double-spaced pages.

The Court received numerous objections by counsel to the Special Master's Hearing Order.[27] The Court denied all of the objections as premature.[28] Further, the Court held that even if such objections were not premature, pursuant to Federal Rule of Civil Procedure 53(f)(5) the Court would review the Special Master's procedural order for abuse of discretion and the Court found that Special Master Klees was well within his discretion in issuing the Hearing Order.

Also in advance of the Special Master's hearing, Mr. Gianna, counsel to the Special Master, filed a Motion to Strike himself as a witness.[29] Mr. Gianna was listed as a potential witness on the lists of Val P. Exnicios, Darleen M. Jacobs, Walter C. Dumas, Michael G. Stag and Robert M. Becnel. Mr. Exnicios and Mr. Stag opposed the motion.[30] The Court granted Mr. Gianna's motion holding that as counsel to the Special Master, Mr. Gianna could not be called to testify because the policy considerations that prevent a judge from testifying apply with equal weight to Mr. Gianna.[31] Further, the Court concluded that this situation was the same or similar to the situation in which a party sought to call the Court's law clerk to testify which is routinely disallowed.[32]

---

**25.** *See* Rec. Doc. Nos. 2325, 2330, 2338, 2339, 2341, 2345, 2346, 2347, 2348, 2353, 2354, 2355.

**26.** *See* Rec. Doc. No. 2360.

**27.** *See* Rec. Doc. Nos. 2351, 2356, 2361, and 2366.

**28.** *See* Rec. Doc. No. 2377.

**29.** *See* Rec. Doc. No. 2371.

**30.** *See* Rec. Doc. No. 2372.

**31.** *See* Rec. Doc. No. 2382.

**32.** After Mr. Exnicios filed his objections to Mr. Gianna's motion, Mr. Gianna filed a motion for sanctions against Mr. Exnicios (Rec. Doc. No. 2379). Mr. Gianna argued that Mr. Exnicios failed to make a reasonable inquiry into the assertions in his pleading, and that several of Mr. Exnicios' assertions were patently untrue. The Court referred Mr. Gian-

Special Master Klees' hearing began in the afternoon of May 22, 2008, and continued to Friday, May 23, 2008. During the hearing, the Special Master received testimony from 14 witnesses. The record at that point consisted of 22 depositions, 46 common benefit affidavits, 4 challenge affidavits, several hundred pages of briefs and legal submissions and approximately 200 pages of transcript. The Special Master took all of the above into consideration and compiled his Final Report. In his Final Report, the Special Master recommended the following allocation of Common Benefit Fees:

| Attorney | Fee Awarded |
| --- | --- |
| Sidney D. Torres, III | $4,257,000 |
| Gerald E. Meunier | $2,800,000 |
| Hugh P. "Skip" Lambert | $2,800,000 |
| Joseph M. Bruno | $2,800,000 |
| Scott R. Bickford | $2,200,000 |
| Ronnie G. Penton | $2,200,000 |
| Daniel E. Becnel, Jr. | $2,000,000 |
| Jerald N. "Jay" Andry, Jr. | $1,100,000 |
| Mickey P. Landry | $1,100,000 |
| Salvador E. Gutierrez, Jr. | $1,100,000 |
| Darleen M. Jacobs | $1,000,000 |
| Richard J. Arsenault | $ 950,000 |
| Robert M. Becnel | $ 700,000 |
| Anthony D. Irpino | $ 600,000 |
| E. Carroll Rogers | $ 580,000 |
| Val P. Exnicios | $ 558,000 |
| Walter J. Leger, Jr. | $ 500,000 |
| Michael G. Stag | $ 400,000 |
| Conrad S.P. Williams, III | $ 350,000 |
| Diane K. Zink | $ 310,000 |
| Gregory P. DiLeo | $ 300,000 |
| Lance V. Licciardi | $ 260,000 |
| Dawn M. Barrios | $ 258,000 |
| Madro Bandaries | $ 223,650 |
| J. Van Robichaux, Jr. | $ 115,000 |
| Mark P. Glago | $ 112,750 |
| Rebecca A. Cunard | $ 103,050 |
| Benjamin D. Beychock | $ 100,950 |
| William E. Bradley | $ 100,500 |
| Jessie L. Wimberly, IV | $ 100,000 |
| Walter C. Dumas | $ 84,000 |
| Bruce C. Betzer | $ 67,500 |
| Keith Couture | $ 60,000 |
| Jonathan B. Andry | $ 50,000 |
| Michael G. Calogero | $ 47,500 |
| Scott M. Galante | $ 47,500 |
| Ronald J. Favre | $ 45,000 |
| Jessie L. Wimberly, III | $ 40,000 |
| Stephen J. Herman | $ 35,000 |
| Les A. Martin | $ 28,000 |
| Michael Hingle | $ 25,000 |
| Lewis O. Unglesby | $ 15,000 |
| Shirin E. Harrell | $ 15,000 |
| Wiley J. Beevers | $ 0 |
| Sean D. Alfortish | $ 0 |

### G. The Special Master's Final Report

This Final Report was delivered to the Court on August 22, 2008. As with the Preliminary Report, the Court entered the Final Report, as well as the supporting materials, into the record of this matter, forwarded it to all counsel, and placed a copy on the Court's website dedicated to this litigation and accessible to all.

In the Order entering the Final Report into the record, the Court, pursuant to Federal Rule of Civil Procedure 53, afforded counsel over 20 days to file objections. The Court also scheduled a hearing for October 1, 2008, at 9:00 a.m. to hear argument regarding any objections to the Special Master's recommendations. The Court received a number of objections and heard argument from the objectors. The Court is now prepared to make a final allocation of attorneys' fees among Plaintiffs' counsel.

## II. LAW & ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 53(f), the district court is to review *de novo* all objections to findings of fact made or recommended by a special master. *In re Vioxx Prods.Liab. Litig.*, 501 F.Supp.2d 789, 813 (E.D.La.2007).

na's motion to Magistrate Judge Wilkinson (Rec.Doc. No. 2383). Mr. Exnicios eventually filed a Notice of Withdrawal and/Correct of his opposition (Rec.Doc. No. 2405), and, accordingly, Judge Wilkinson dismissed Mr. Gianna's Motion for Sanction as moot (Rec.Doc. No. 2426).

## B. Review of the Special Master's Process

As stated above, the Court had initially left the recommendation for the allocation of the Common Benefit Fund to the attorneys. "Ideally, allocation is a private matter to be handled among class counsel." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 357 (N.D.Ga.1993); *see also Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir.1992). This is so because class counsel are generally better able to evaluate the weight and merit of each other's contribution to the case. *See In re "Agent Orange" Product Liability Litig.*, 818 F.2d 216, 223 (2d Cir.1987). Furthermore, in this case it seemed particularly appropriate for the attorneys to have a chance to recommend the proper allocation because it was all their money. The fund is in addition to and separate and distinct from the claimants' portion. The claimants' portion was not reduced or affected in any way. It was all paid by Murphy as a common benefit for plaintiffs' counsel. Nevertheless, the attorneys were unable to agree on an allocation.

The Court could have appointed a committee made up of counsel to allocate the Common Benefit Fund.[33] *See In re Diet Drugs*, 2002 WL 32154197, at *22 (E.D.Pa. Oct.3, 2002) (collecting cases). But a committee of the whole had their opportunity and they failed to agree. It seemed pointless, therefore, to appoint a smaller committee and expect them to reach an agree-ment when the entire PSC could not. Therefore, the Court appointed a well qualified and independent special master to take evidence and recommend an allocation.

The Court takes seriously its responsibility to closely scrutinize the attorneys' fee allocation. *See In re Ivan F. Boesky Secs. Litig.*, 888 F.Supp. 551 (S.D.N.Y. 1995). Indeed, because the Court has elected to appoint a special master pursuant to Federal Rule of Civil Procedure 53, the Rules demand that the Court review *de novo* the Special Master's suggestions in light of the fact that various counsel have filed objections to the Special Master's Final Report. *See* Fed.R.Civ.P. 53(f). *See also In re Vioxx*, 501 F.Supp.2d at 813.

## C. Factors in Determining an Allocation

■ Before determining the proper fee allocation in this case some general comments are in order. The fund is a finite amount and is in the registry of the Court. The task at this point is to allocate the fund. On April 20, 2007, the Court held a status conference with plaintiffs' counsel to discuss the allocation of the Common Benefit Fund and the appointment of Judge Klees as Special Master. At that status conference, the Court made some initial comments regarding the process and factors to be generally considered in allocating the Common Benefit Fund.[34] In essence, it is this Court's view that for the

---

**33.** As the Fifth Circuit has recently noted, there are conflicts of interest inherent in this approach: the members of the committee suggest to the court a division of a limited fund among themselves and other firms. *In re High Sulfur Content Gasoline Prods.Liab.Litig.*, 517 F.3d 220, 235 (5th Cir.2008) (citing *In re Diet Drugs Prod. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir.2005) (Ambro, J., concurring)). The Fifth Circuit has also stated that when appointing a committee to allocate a lump-sum fee award, the district court "is not relieved . . . of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." *In re High Sulfur Content*, 517 F.3d at 227.

**34.** A copy of the transcript from this status conference can be found at the Court's website under the Current Developments section for April 20, 2007.

plaintiffs' counsel to achieve a successful resolution of a class action it takes (besides the law and facts which are necessary and common to any successful legal action) three additional factors: financial resources, numbers of cases, and legal work. In fairness, each of these factors has to be accounted for in some way because in reality each may play a role in the successful resolution of the case, albeit not an equal role. These factors will be discussed in turn.

## 1. Financial Resources

Class actions, because of their very complexity and scope, generally take more financial resources than the normal case. They involve tens or hundreds or even thousands of claimants; usually require dozens or hundreds of depositions; entail the production, review and organization of thousands or sometimes millions of documents; and necessitate the location of and consultation with numerous experts. And that is just the beginning of the development of a class action. All of this activity requires considerable economic expenditures which are usually advanced by plaintiffs' counsel. At the conclusion of the case, if they are successful, it is appropriate to reimburse plaintiffs' counsel for these expenditures.

There are several ways of dealing with this factor when it comes to common benefit allocation. It can be left up to the plaintiffs' committee to handle or the Court can address it. In the present case, the Court handled it in the following fashion. Recognizing that this case was resolved in approximately one year from the date it was filed and that the expended cost was at moderate risk, the Court allowed the costs to be returned plus 100% interest. Thus, if someone incurred out of pocket costs of $100,000, they received $200,000 (their initial $100,000 plus another $100,000). These amounts were paid out of the Common Benefit Fund and have been distributed to the appropriate attorneys.[35] Thus, it is no longer an issue in this litigation.

## 2. Number of Cases

Unlike the usual case, in order for a class action to be certified it must satisfy a numerosity requirement. As stated above, the Court certified this case as a class action pursuant to Federal Rule of Civil Procedure 23, and one of the factors that the Court took into account in doing so was the large number of involved cases. *See* Fed.R.Civ.P. 23(a)(1); *Turner,* 234 F.R.D. at 604. In this case there were thousands of claimants. Without this "critical mass," these cases would merely be a number of related cases that may or may not be consolidated for discovery purposes. But it was the critical mass that allowed this case to become a class action. In the real world of litigation (and also in fairness) the number of cases handled by a specific attorney has to be accounted for in some fashion. If it is not, a large number of cases opt out or an attempt is made to establish separate class actions in other forums and chaos is injected into the litigation. Furthermore, maintaining contact with a large number of plaintiffs takes time and effort, and when properly done promotes cooperation and cohesiveness in the class which benefits the group as a whole and, therefore, deserves some recognition.

This factor, however, must not be over-emphasized. If it is, attorneys may be misled into thinking that they can simply produce cases and do little or no work and reap huge financial rewards, a certain recipe for disaster for the litigants, the attorneys, and the legal profession.

35. Doc. No. 1521

There are some who might argue that it is best for members of a plaintiffs' committee to have no personal cases so they can devote their efforts to the class as a whole and not be distracted by the needs of their individual clients. This argument rings hollow on close scrutiny. It would allow an attorney to come into a case and literally take it over without any personal responsibility, professional commitment, or allegiance to any of the litigants. Such an attorney's allegiance would be to the attorneys who recommended that person for a position on the committee or even the judge who appointed him or her, and not the injured clients themselves. In fact under this scenario an attorney could handle a case without even meeting a client. What would happen if it became necessary to try individual cases? Could such an attorney try them? Furthermore, would such an attorney be expected to invest money in a case in which that attorney has no traditional professional interest? Is it ethical for an attorney to invest money in a case in which that attorney has no individual clients? Would this approach create a caste of attorneys who serve only as bankers or who merely travel from one class action to the next without any sense of loyalty to the class members, the local bar or the community? These and other questions suggest that this is a recipe for an even greater disaster.

This Court is persuaded that the best approach is to recognize the number of cases handled by a specific attorney, but to monitor it, minimize its importance and to consider it only along with the time and common benefit work done by that attorney. In the present case, this factor was of only minimal significance since in most instances the attorneys with significant case inventories performed the majority of the productive work and supplied significant resources.[36]

### 3. Attorneys' Labor

■ The work that an attorney devotes to a class action is generally the principal factor by far in determining the attorneys' portion of the common benefit fee. Indeed, in the present case, this is the factor that plays the dominant role in determining the proper allocation of the fee. First, a few general comments are appropriate to frame the discussion. The attorney labor portion of the Court's consideration consists of two sub-parts: time and type of work.

The first sub-part, the time portion, is most accurate when it is recorded contemporaneously with the work. This often presents a challenge to plaintiff lawyers who traditionally do not record time. Their inexperience in record keeping or their outright aversion to keeping time often results in a crash program of reconstructing time records. This practice sometimes injects glaring inaccuracies into the process and has to be taken into account in determining the appropriate time to be allotted to a particular counsel.

The next sub-part of the Court's analysis is the nature of the work. In a case of this kind, not all types of work are created equal. Hours spent taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of the case are some of the more significant types

---

**36.** That is not to say in a different class action, a Court would not give greater or lesser weight to this factor. Further, a Court may also give greater or lesser consideration, if it considers it at all, in a different type of collective action, such as a multidistrict litigation.

of work that a case of this sort requires and deserves the most recognition. This, of course, is not the only type of work that such a case requires. Documents must be reviewed, categorized, and analyzed; e-mails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the litigation must be monitored. This work, while necessary and often time consuming, does not deserve equal treatment when allotting fees.

Another type of work that is often necessary in a case of this kind and which was prominent in this case is the labor involved in the disbursement of the settlement funds to the claimants. As mentioned, at this point the plaintiffs have all received their settlement funds but this took time and effort. The time spent by counsel in the settlement program office, assisting plaintiffs in filling out claims forms, assisting plaintiffs in curing deficiencies in their claims forms, addressing issues with plaintiffs' mortgage lenders, and addressing potential issues with the Louisiana Road Home Program was vital to the ultimate success of this case. The Court is pleased and proud of the effort of the plaintiffs' counsel in ensuring that the plaintiffs received their funds quickly and fairly. This class action was settled within a year of the tragedy which spawned it. It was certainly a case in which all of the attorneys involved on both sides should be commended for their efforts. However, the hours spent by counsel after the approval of the settlement agreement did not aid in the creation of the settlement fund, and, as a result, the Court concludes that it cannot treat the hours spent by counsel in administering the settlement program on a par with the hours spent by counsel who helped create the settlement and Common Benefit Fund. But because of the unique challenges wrought by Hurricane Katrina and the resulting diaspora, the post settle-

ment work is entitled to be generously recognized.

Finally, a word about the structure of the plaintiff committee and the significance of the title assigned to its members. As the Court sees it, any title bestowed on counsel in this case, whether it be "Liaison Counsel," "Executive Committee member," or "Steering Committee member," is merely an opportunity to work. Counsel can either take this title and become a spectator and inactively watch as others engage, or counsel can take the field and make a meaningful contribution to the litigation. A title does not automatically entitle counsel to compensation. Indeed, in this case the Court appointed any and every counsel to the Plaintiffs' Steering Committee that requested to be on that committee. This way any attorney who wanted to work on this case had the opportunity to get involved; from the Court's perspective, no one was shut out of this case who wanted to be involved. What counsel did or did not do with this opportunity is a different matter. With these concepts in mind the Court addresses the appropriate allocation of common benefit fees.

### D. The Allocation

Typically, in class actions the common benefit fund is derived from the claimants' portion in the form of a percentage of the amount recovered. Manual for Complex Litigation (Fourth) § 14.12 (2004). In such a situation courts often arrive at the percentage by analyzing each attorney's entitlement in terms of the *Johnson* factors and then totaling the awards to get a percentage. This analysis is usually done in connection with the fairness hearing since it is necessary to determine whether the net amount after the deduction of common benefit fees is fair to the claimants. In the present case, as mentioned, the

common benefit fund was separate and distinct from the settlement fund. Its amount was established by the Court which computed the common benefit work performed by all counsel as a group. This computation included fixing a percentage based on customary standards and testing it with a detailed *Johnson* factor analysis and lodestar cross check. The approach used by the Court is summarized above in this opinion and is set forth in detail in its previous opinion in this case. *See Turner, et al. v. Murphy Oil, USA, Inc.*, 472 F.Supp.2d 830 (E.D.La.2007). At this point it is necessary to apportion this common benefit amount among counsel. This apportionment is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of the other counsel. *In re High Sulfur Content Gasoline Prods. Liab. Litigation*, 517 F.3d 220, 232 (5th Cir.2008); *In re Copley Pharmaceutical, Inc.* 50 F.Supp.2d 1141, 1149 (D.Wyo. 1999); *Derfner & Wolf, Court Awarded Attorney Fees*, ¶ 17.02 at 17–7 & n. 23 (1998).

Allocating a limited pot of common benefit fees among numerous counsel, all of whom are talented and capable attorneys and many of whom have made a significant contribution to the ultimate success of this case, is an unenviable task that is sure to lead to hurt feelings and bruised egos. *See, In re Copley Pharm. Inc.*, MDL No. 94–1013, 50 F.Supp.2d 1141, 1148 (D. Wyo. 1999). Nevertheless, it has to be done and since the plaintiff attorneys have not been able to agree upon the allocation of fees among themselves, the Court will determine the appropriate allocation. In preparation for this task the Court has reviewed the law applicable to this issue, the reports of the Special Master as well as the depositions, transcript and other material contained in the record. Furthermore, this Court has been in a position to observe the work the attorneys performed in court

during the course of this litigation and has been kept advised of much of the work performed outside of court. Specifically, in addition to many court hearings involving discovery disputes, substantive motions, class certification issues, the Court held weekly and monthly status conferences in open court during which counsel reported on what was being done and (frequently) who was doing it. Based on its review of the applicable law, the mentioned documentation as well as its observations during the course of this case, the Court makes the following findings and allocations:

### *Sidney D. Torres, III*

■ Sidney D. Torres, III, served as Liaison Counsel and was a member of the Executive Committee. Mr. Torres played a key role in bringing about the remarkably fast resolution of this case. In addition to contributing an enormous amount of quality legal work and time, he provided the leadership, organization, experience, motivation, enthusiasm, and knowledge that were essential to the effective resolution of this case. His involvement from the filing of the cases through resolution of this matter was considerable. Mr. Torres was involved in each and every aspect of the handling of the litigation from discovery through preparation for trial and ultimate settlement. He participated in every substantive meeting and conference; he chaired every Court status conference for the plaintiffs, reviewed most every document, made oral presentations in Court, assisted in the development of the litigation and settlement strategies, coordinated litigation and settlement efforts, participated in the negotiations that led to the settlement, and was the cohesive force behind the plaintiffs' committee. His work was excellent and his efforts had a significant effect in the prompt and successful resolution of this matter. He has practiced law

in St. Bernard Parish for over 30 years, has extensive experience in class actions, and has an excellent reputation.

A review of his time sheets submitted to the Special Master shows that he logged 3,102 hours of time in this matter. His co-counsel and member of his firm, Ms. Roberta Burns, logged 1,933 hours. His staff also contributed 2,820 hours to this effort.

The Court finds that considering the *Johnson* factors of time, labor, requisite skill, experience and reputation a fee allocation of $4,257,000 will fairly compensate Mr. Torres for his efforts in this matter.

### Joseph M. Bruno

■ Mr. Bruno was a member of the PSC and the Discovery and Trial Committees. Mr. Bruno "first chaired" 20 critical depositions and "second chaired" 10 others. Mr. Bruno had a large role in deposing the defense experts. He guided the direction of the case and assisted in the development of the litigation strategy. He also coordinated the litigation efforts of the PSC.

Mr. Bruno received and collated thousands of pages of documents from Murphy Oil Company, took the corporate deposition of Murphy Oil and developed a strategy to defeat Murphy's "empty chair" defense. Mr. Bruno also deposed the Army Corps of Engineers and the Murphy experts on the MRGO failure. He deposed the Murphy executives and sought to establish, through them, that Murphy might not have been forthright about the size of the spill.

Mr. Bruno's time sheets indicate that he worked 2,088 hours and his firm associates worked 701 hours. His paralegals contributed 229 hours to the common benefit.

It is clear from the evidence that Mr. Bruno was in charge of the discovery efforts and guided the deposition process. The Court finds that his work with the depositions of the defendant was a key to attacking the Murphy defenses and pushing the defendant to a settlement.

Mr. Bruno's contributions contributed directly to the prompt resolution of this case. He has considerable experience in mass tort litigation and has handled similar matters in the past.

The Court, therefore, finds that a fee allocation of $2,800,000 will fairly compensate Mr. Bruno for his outstanding efforts.

### Hugh P. "Skip" Lambert

■ Mr. Lambert was a member of the PSC and the Science and Expert Committee. He worked with over 25 experts in various fields and prepared these experts to testify at deposition and if a trial had been needed.

Mr. Lambert was designated lead counsel in 31 depositions and was actively present at 13 others. His partner, Linda Nelson, attended two depositions. Mr. Lambert devoted his entire law firm to this case. His firm reviewed 23,000 documents; his law offices served as the "war room" for this case; he dealt with the experts in the science of oil fingerprinting, assisted in developing the litigation strategy, prepared to examine witnesses at the Class Certification Hearing, coordinated the sampling of soils in the St. Bernard area affected by the spill, used his staff and office for over 55 meetings, gathered data from Impact Weather, inspected the tank involved in this case on 12 occasions, drew maps of the affected areas, proposed the class boundaries, worked with surveyors, worked on remediation plans, assisted with video clips for the production of a DVD and developed metallurgical assessment of failure analysis protocols. Mr. Lambert also offered the PSC the use of his private aircraft.

Mr. Lambert's law firm's time sheets are exceptionally well described. He devoted over 2,040 hours to the matter and

his firm contributed an additional 2,289 hours related to this case.

Mr. Lambert was no doubt a major contributor to the success of this litigation and his common benefit work was outstanding. He brought to this litigation considerable experience and knowledge. His work was particularly helpful in organizing and presenting evidence dealing with science, engineering and technical areas.

The Court, therefore, finds that a fee allocation of $2,800,000 to Mr. Lambert is fair and appropriate based upon the evidence submitted.

### Gerald E. Meunier

■ Mr. Meunier was a member of the PSC and head of the Law Committee. He worked with expert, Mr. Kilpatrick, on property evaluation issues.

As Chair of the Law Committee, he prepared and argued all motions before the court on behalf of the class. Mr. Meunier and his firm did the research behind most of the pleadings filed in the case, he attended every conference and meeting with this Court and presented the plaintiffs' case at the focus groups and at the mediation focus group presentation. He devoted over 1500 hours in this matter and his firm logged over 300 additional hours. Mr. Meunier's contributions were all direct and meaningful and encompassed every aspect of this case. He brought to the case superior writing and forensic skills which resulted in clear and persuasive presentations in court.

The evidence shows that Mr. Meunier's hours are all related to the common benefit. As the "face" of the PSC in this Court, and as the developer of the major strategies that were converted into causes of action, it is clear that Mr. Meunier's contribution was enormously important. Consequently, a fee allocation of $2,800,000 to Mr. Meunier is fair and appropriate.

### Scott R. Bickford

■ Scott Bickford was a member of the PSC and the Trial and Settlement Committees. Mr. Bickford acted as lead counsel in 8 depositions and attended 10 other depositions.

Mr. Bickford's work on the trial committee was very helpful. The contributions of Mr. Bickford and Mr. Penton toward the creation and the implementation of the trial strategy in this case were creative, novel and well done. Mr. Bickford is an experienced and accomplished trial lawyer and the evidence of trial preparation can be seen in the mock jury presentation prepared by the trial and settlement teams presented by Mr. Meunier, Mr. Penton and Mr. Bickford. Mr. Bickford's contribution to the strategy and ultimately the settlement of this case clearly benefitted the class.

Mr. Bickford took photos and videos of the Murphy property, did FOIA requests, worked on public information websites, coded discovery documents, and filmed, edited, directed and produced the video used at the mediation presentation. Mr. Bickford prepared for the mock trial and participated in the mock trial. He also performed legal briefing on the Army Corps of Engineers fault issue, drafted motions in limine and prepared an exhibit list for trial.

Mr. Bickford's office coded and maintained a 67,000 plus page document database. He worked hand in hand with Mr. Penton on the final trial strategy and helped draft the pre-trial order.

Many attorneys in Mr. Bickford's firm assisted him with these tasks. In general, the timesheets submitted were very well described. Mr. Bickford's firm contributed 3,406 hours to the common benefit, of which 1,328 were for paralegal or staff time.

In view of Mr. Bickford's time and labor and his contribution to the development of the case, this Court allocates a fee of $2,200,000 to Mr. Bickford as fair and appropriate.

### Ronnie G. Penton

Mr. Penton's contribution to the common benefit mirrored Mr. Bickford's. As a member of the PSC and the Trial Team, Mr. Penton co-chaired the Trial Team and was responsible for the creation of the trial strategy, a strategy that ultimately led to the settlement of this matter. Mr. Penton is a very experienced and accomplished trial lawyer and the evidence of his preparation can be seen in the mock jury presentation prepared by the trial and settlement teams and presented by him and other members of his team. Mr. Penton's contribution to the common benefit is therefore significant.

He participated in four plant inspections, investigated plant policies and procedures, crude oil supplies, the design and maintenance of the tank in question, Murphy hurricane procedures and storm surge flooding procedures. He co-authored many important pleadings and, in effect, coordinated the entire litigation so that the case was ready for trial in a very short period of time. He did this along with Mr. Bickford and the other members of the trial team. Mr. Penton acted as lead counsel in 8 depositions and attended 10 other depositions.

Mr. Penton presented the plaintiffs' case for the focus groups and created the visual aids for the mediation presentations. He worked with Mr. Bickford on the mediation video presentation that directly led to the settlement of this matter.

Mr. Penton's time sheets are well described and show approximately 1,750 hours worked by Mr. Penton.

Mr. Penton's contribution to the common benefit of the class was significant.

The Court therefore allocates a fee of $2,200,000 to Mr. Penton as fair and appropriate.

### Daniel E. Becnel, Jr.

Mr. Becnel was a member of the Executive and the Expert Committees. He retained and worked with Drs. Fthenakis, Sago, Cone, Brautbar, Ginsberg, Kilpatrick, Jacobs, Wilson and Templet, and with Mr. Lieberman, Mr. Miller, Professor Ciolino, Mr. Stan Guidry, Mr. Charles Duhon, Mr. Frank Willis, Mr. Alan Schuete, Mr. Pat Sellars and Mr. Dave Barnes, a meteorologist. Mr. Becnel took a helicopter tour of Murphy Oil with Messrs. Lambert, Penton, Torres and Bruno. His office performed legal research and Mr. Becnel's attorneys assisted attorneys who were displaced with office space and equipment. He helped formulate the PSC, filed a Motion to Consolidate and, during the important first phase of the case, inspected the tank with his experts. Mr. Becnel also handled the accounting and levied assessments during the case.

Mr. Becnel worked on the litigation strategy, pleadings, experts' depositions, finances, and formulated the logistics for the selection of experts and participated in settlement negotiations. He also worked on the video used at the mediation presentation, attended status conferences and met regularly with the Executive Committee. He provided employees to the claims office.

Mr. Becnel's time sheets totaled 816 hours. He also submitted time sheets for his associate, Mr. Darryl Becnel, in the amount of 457 hours. Other members of his staff worked for the common benefit. In total, Mr. Becnel's office submitted time in the amount of 3,464. Mr. Becnel is experienced in mass tort cases but it is actual work and not experience alone that entitles one to compensation in matters of this sort. In this case a significant portion of

the work attributed to Mr. Becnel was performed by others in his office. For that reason he is not entitled to the same level of compensation as those discussed above. Nevertheless, his experience and reputation allowed him to secure the services of notable expert witnesses who proved helpful in the liability aspect of the case. Thus he is entitled to significant recognition.

The Court allocates a fee of $2,000,000 to Mr. Becnel as fair and appropriate based upon the evidence submitted.

### Jerald N. (Jay) Andry, Jr.

■ Jay Andry was the co-chair of the Proof of Claims Committee. He worked with experts Todd Hilsee and Danny Clavier.

Mr. Andry headed the claims office. He worked to develop the proof of claim forms, worked with the individual plaintiffs to translate their claims into something that could be included in the class. Mr. Andry supervised the other attorneys who assisted at the claims office, worked with Global Risk Solutions, the court's dispersing agent and participated in the notice hearing. Mr. Andry was present during approximately 12 depositions of his own clients. He prepared his clients for depositions, acted as lead counsel in one deposition and participated as second chair in five depositions. Mr. Andry also trained attorneys to work in the claims office.

Mr. Andry submitted 2,518 hours for the attorneys of his firm who worked on the case.

Mr. Andry's work in the claims office contributed greatly to the efficient, effective and timely disbursement of the funds to the litigants. This work was very significant and deserves to be generously recognized but it did not create the settlement fund and, therefore, is not entitled to the same recognition as the work that did. But in addition to his claims office work Mr. Andry also played a role in the settlement aspect of the case in working with the settlement committee to establish zones which made settlement more acceptable and rational. A sum of $1,100,000 was recommended as being appropriate. In view of the time and labor expended by Mr Andry in addition to the novelty of his efforts particularly in the settlement aspect of the case the Court finds an upward adjustment is in order and allocates a fee of $1,200,000 to Mr. Andry as fair and appropriate.

### Mickey P. Landry

Mr. Landry was a member of the PSC and the Settlement Committee.

Mr. Landry filed the first class action against Murphy. He worked on insurance and fault allocation issues, but his work on the settlement process almost from inception contributed significantly to the common benefit. He participated in the negotiation of the case and played a role in every meeting regarding settlement. He was one of the drafters of the memorandum of understanding after the settlement was verbally reached. He also worked with mortgage lenders regarding liens on settlement funds. Mr. Landry determined Murphy's excess liability coverage, and devised a motion to exclude evidence of the fault of the Corps of Engineers after a previous motion had failed.

Mr. Landry worked approximately 1,546 hours. Although some of the time entries are not described with particularity, the Court concludes that all of the hours were for the common benefit. Mr. Landry's work in helping to create the zones of the affected areas and negotiating with the defendant and the mortgage lenders was of significant benefit to the class. A recommendation of $1,100,000 was made as being appropriate for his portion of the common benefit fee. Because of his significant role in the settlement aspect of the case the Court finds that an upward ad-

justment is in order and, therefore, allocates a fee of $1,200,000 to Mr. Landry as fair and appropriate.

### Darleen M. Jacobs

■ Ms. Darleen Jacobs chaired the Damages Committee, a significant position that played a part in the prompt resolution of this case. As Chair of the Damages Committee, Ms. Jacobs developed 30 areas of potential damages and worked with the plaintiffs' damage experts. She was ready to begin the damage phase immediately after the liability phase if necessary. Ms. Jacobs submitted 825.50 hours of time expended on this matter. Of these hours 381 were dedicated to the preparation of the damage aspect of the case and 444.50 were dedicated to a review of material and attending meetings. The Special Master recommends an allotment of $1,000,000 to Ms Jacobs. The Court finds that Ms. Jacobs' contribution to the settlement of the case was important, in that her work focused on the trial of the damage portion of the case which she was prepared to proceed with if necessary immediately after the liability phase. She is an experienced trial lawyer and needed no instruction or supervision. Although a trial was not necessary, her work was a significant factor in encouraging a resolution of this matter.

The Court, therefore, finds that an adjustment is in order and allocates a fee of $1,100,000 to Ms. Jacobs.

### Salvador E. Gutierrez, Jr.

■ Mr. Gutierrez was a member of the PSC. His work involved interviewing eyewitnesses for the class certification hearing. He also performed factual investigation of the oil spill, worked to resolve interventions filed by the mortgage lenders, determined the proper clean-up protocol for the properties and worked out the demolition and debris removal issues with St. Bernard Parish authorities. He also worked closely with Members of Congress to keep Road Home funds from being reduced by Murphy settlement funds. Mr. Gutierrez worked in and helped supervised the claims office. His work furthered the settlement of this case by assisting in the establishment of the settlement zones. He also worked to develop the proof of claim forms, helped with the mediation process and overall, provided a voice to and for the residents of St. Bernard Parish. He attended two important depositions.

Mr. Gutierrez's hours approximated 775 for himself and his law partner.

The Special Master recommends an allocation of $1,100,000. The Court finds that Mr. Gutierrez's work contributed to the common benefit, and was helpful in keeping the class together. Nevertheless, most of this work was not directed to trial preparation or briefing or settlement negotiation or the other areas of work which actually created the settlement fund and, therefore, an adjustment is in order.

The Court, therefore, allocates a fee of $1,000,000 to Mr. Gutierrez, which it finds is fair and appropriate based on the number of hours he expended and the significance of his efforts. The fee per hour ratio is high but his efforts played a significant role in making the settlement acceptable to the class members and he is entitled to this amount.

### Richard J. Arsenault

Mr. Arsenault was a member of the Executive Committee and also worked with the Damages, Trial, Expert and Settlement Committees.

Mr. Arsenault hired expert Frank Willis and worked with experts Arthur Miller, John Kilpatrick, Charles Duhon, Jack Pardue, Dr. Bea and Mr. Todd Hilsee. Mr. Arsenault's common benefit work amounted to legal research regarding discovery from class members, the Act of God defense, *Daubert* standards and comparative

fault. He drafted Motions for Summary Judgment, *Daubert* motions and motions in limine. Mr. Arsenault took part in discovery and assisted in formulating a trial strategy. He assisted in drafting the Memo of Understanding concerning the settlement of this case and worked on the mediation and settlement of the matter.

Mr. Arsenault's time sheets are well described; however, a large part of the time logged was devoted to email review that did not meaningfully contribute to the settlement. Mr. Arsenault submitted 2,827 hours for his entire office, 1,512 hours of that time were time logged by his associates.

Mr. Arsenault's role in this litigation was more remote than hands on in that much of the work assigned to him was performed by others in his office.

The Special Master recommended a fee allocation of $950,000 as being fair and appropriate. The Court feels that an upward adjustment is in order. Mr. Arsenault's work on the Daubert hearings was particularly well done and effective. The Court, therefore, finds that a fee allocation of $1,000,000 better represents Mr. Arsenault's contribution considering the testimony introduced at the May 22, 2008 hearing before the Special Master.

### Robert M. Becnel

Mr. Robert Becnel was co-chair of the Proof of Claims Committee and a member of the PSC. Mr. Becnel worked with experts Drs. Sajo, Kilpatrick, Templet, Wilson and Messrs. Duhon and Kaltofen.

Mr. Becnel also worked with class representatives and fact witnesses. He was present at most of the 87 depositions taken of the class members and assisted Mr. Andry in the organization of the claims office. He helped supervise 18 attorneys and 12 staff members at the claims office and met with many of the claimants. He also helped many of the St. Bernard residents to file their claims.

Mr. Becnel also worked on complicated issues regarding land ownership and determining exactly who the claimant was. He notarized claim forms and advised Global Risk. He participated in all court proceedings, PSC meetings and focus groups. He also worked with Governor Blanco to make sure the Road Home money would not be offset by any settlement with Murphy Oil Company.

Mr. Becnel submitted only time summary sheets. His time amounts to approximately 621 hours. Mr. Jay Andry testified about Mr. Becnel's involvement in the claims office and his work there and his testimony assisted the Special Master in understanding Mr. Becnel's role.

Mr. Becnel, along with Mr. Jay Andry, was involved in a very critical part of the litigation, the claims process. The work of Mr. Becnel and Mr. Andry at the claims office was vital in keeping the settlement in place because only 360 opt out claims were permitted by the Court. The work at the claims office was difficult because everyone who came there to make a claim had a different situation that needed sorting out. Therefore, Mr. Becnel's contribution to the settlement effort was substantial.

The Court therefore allocates a fee of $700,000 to Mr. Becnel as fair and appropriate.

### Anthony D. Irpino

Mr. Irpino is a member of the PSC, a Co–Chair of the Class Action and Class Representation Committee and a member of the Damages Committee.

He helped to locate and retain the property diminution experts.

He oversaw and handled matters relating to class membership and the 26 named plaintiffs. He performed legal research for the Law Committee, worked on the Damages Committee and worked in the

claims office. He also worked on the Class Communication Committee.

Mr. Irpino's hours, after revision subsequent to his deposition, amount to approximately 1,900 hours spent. Although much of the time is for reviewing emails and pleadings, his descriptions of the tasks are well described and his work, as evidenced by his affidavit and his deposition, convinces the Special Master that his contribution was significant.

The Court finds that Mr. Irpino was an active member of the PSC. Although he did not perform a significant leadership role, his contributions to the common benefit were important.

The Court therefore allocates a fee of $600,000 to Mr. Irpino as fair and appropriate.

### Val P. Exnicios

■ Mr. Exnicios was a member of the Executive Committee. Mr. Exnicios worked with experts Drs. Penland, Bianchini and Kilpatrick.

Mr. Exnicios organized the first list of plaintiff attorneys that were interested in suing Murphy and organized the first teleconference with the Court regarding formation of the PSC. He assisted in drafting pleadings, approved discovery efforts, and the retaining of experts, and reviewed the litigation and settlement strategy. He supervised the Damages Committee and the Class Action Committee, as well as the Law Committee when Donni Young was in charge of the Law Committee.

Mr. Exnicios submitted 1,826 hours as time expended on this case and 40 hours submitted for his associates' time. Mr. Exnicios' time is well-described, but the time spent is primarily for review of emails and pleadings and monitoring the work of other highly experienced people.

The Court finds that Mr. Exnicios' role in the litigation was much less significant than the other members of the Executive Committee and other members of the PSC and was mainly supervisory in nature. The problem in this case in placing a high value on supervisory work is that the committee members who actually did the work such as taking depositions, arguing motions, preparing for trial, etc., were highly experienced and capable individuals who did not need any supervision. It is obvious from this Court's review of Mr. Exnicios' time sheets, the deposition testimony, and the testimony given at the May 22–23, 2008 hearing (see e. g. deposition testimony of Joseph Bruno and Hugh Lambert) that his participation was not on the level of other Executive Committee members or members of the PSC, in particular the members of the Discovery and Trial Teams. The Court finds that Mr. Exnicios made no independent significant contributions to the resolution of this matter not made by other counsel and his contributions did not differ from those made by other counsel. Mr. Exnicios monitored the case much more than he participated in it. He had the opportunity to take depositions, argue motions, take testimony and do other things that other members of the PSC, but he did not seize this opportunity. He did supervise but as mentioned above the people he supervised were very talented and experienced litigators who needed no supervision. But he did spend time and his work, particularly on the damage committee, did contribute to the common benefit so he is entitled to be recognized but not to the same level as other members of the PSC who did the actual hands on work. The Court, therefore, finds that a fee allocation of $558,000 to Mr. Exnicios is fair and appropriate.

The Court has reviewed Mr. Exnicios' Objection to the Special Master's Preliminary Report and finds those objections without substance. Mr. Exnicios submitted no evidence that supports his contention that all members of the Executive

Committee should have received equal fee allocations simply because there were five members of the Executive Committee.

Mr. Exnicios' suggestion that the fee allocations were made without a review of the entire record is rejected. This Court and the Special Master reviewed the entire record of this matter, an enormous record, as set forth in this Opinion. Common sense requires this Court to give consideration to the overall contributions of a lawyer when compared to other counsel.

Mr. Exnicios' statement that the Special Master "apparently relied on selective, self-service *ex parte* communications with some PSC members whose biased rendition of the facts have adversely prejudiced the Special Master's opinions," is without any support and is rejected. Mr. Exnicios had the opportunity to reveal the facts behind his attack on the Special Master and the preliminary fee allocation. The testimony Mr. Exnicios gave at the May, 2008 hearing lacks any factual support for his claim that the Special Master engaged in ex parte communications with members of the PSC or that the Special Master favored anyone.

### E.  Carroll Rogers

Ms. Rogers was a member of the PSC and the Damages Committee.

Ms. Rogers worked with damages experts Drs. Bianchini, Giuvier, Greve, Ginsburg, Shwery and Kilpatrick.

As a member of the Damages Committee, Ms. Rogers researched damage issues and worked with others on the committee to come up with a damages plan. She also worked on locating a witness to be in the mediation video. Ms. Rogers took many photos of the affected area that were to be used at the damages portion of the trial. She also worked in the claims center assisting with claims forms and answering questions posed to her regarding the litigation. Ms. Rogers also worked in the call center answering calls from potential claimants.

Ms. Rogers' time is well-described and includes time submitted by her office staff. Ms. Rogers' time amounted to 534 hours. The Special Master found that Ms. Rogers' contributions were helpful and contributed to the resolution of the case and recommended an apportionment of $580,000.

The Court finds that while well done, the work was more supportive than primary and, therefore, a minor adjustment is necessary. Accordingly, the Court allocates a fee in the amount of $550,000 to Ms. Rogers. The fee per hour ratio is high but is justified in view of the difficulty and diversity of her work as well as the hands on work she performed on the damage committee.

### Walter J. Leger, Jr.

Mr. Leger was a member of the PSC. Mr. Leger's common benefit work consisted of some legal research, investigation, site inspection, and work at the claims office. Mr. Leger submitted in his affidavit 398 hours of time expended in prosecution of this matter. His main contribution was informing the committee members and helping them work through the intricacies associated with the Road Home Program. Since he was head of this Program, his input was particularly helpful. The Special Master recommends an allocation of $500,000 for his work. A review of the time sheets indicates that his work directly and meaningfully contributed to the prosecution and efficient resolution of the matter. However, his work focused largely on the distribution aspect of the case and not on the creation of the settlement fund. The Court, therefore, finds that a reduction would more appropriately reflect Mr. Leger's contribution to the common benefit.

The Court, therefore, finds that a fee of $400,000 is appropriate. The ratio of the

fee to the hours logged by Mr. Leger is high but is fair because his efforts were unique, novel, and very helpful in expediting the resolution of this matter and streamlining the distribution of the settlement funds.

### Michael G. Stag

Mr. Stag was a member of the Executive Committee. Mr. Stag retained Mason Stevenson to do a soil sampling and also retained Dr. Pardue. He worked with Dr. Kaczmar.

Mr. Stag attended committee meetings and conferences and reviewed drafts of discovery to Murphy Oil Company. He was lead attorney in one deposition and attended several others. Following the incident, he interviewed first responders to develop the facts of the case. He also researched topics for the common benefit and worked with the expert committee.

Mr. Stag's time is very poorly reported. His associate's time is also poorly reported. Mr. Stag submits 905 hours as the time expended on this matter.

The Court finds that Mr. Stag's involvement and contributions to the case were not in any way equal to the contributions and involvement of other members of the Executive Committee or the PSC. This Court finds that he monitored the case much more than he participated in it; as such, his contributions to the common benefit were relatively small and those contributions did not differ from those made by other counsel. This class action is the first case in which Mr. Stag was appointed class counsel. (Deposition testimony of Mike Stag, Page 72–first time appointed class counsel). It is inconceivable that Mr. Stag's relative inexperience in class matters such as this guided the efforts of class counsel far more experienced than Mr. Stag or that his supervision of their work made any difference. The Court, therefore, allocates a fee of $400,000 to Mr. Stag which it finds is fair and appropriate.

The Court has reviewed Mr. Stag's objections to the Special Master's Preliminary Report. The Court finds these objections without merit. Only direct and meaningful contributions to the resolution of this case deserve a fee allocation. Mr. Stag's objections to the Preliminary Report of the Special Master are supported by nothing other than his own conclusions and evaluations of the relative contribution of his own work. The Court has also reviewed the description of the hours submitted by Mr. Stag and concludes that the fee allocated to Mr. Stag is commensurate with not just the number, but the nature of the work performed.

### Conrad S.P. (Duke) Williams, III

Mr. Williams was a member of the Trial Committee.

Mr. Williams helped to prepare class counsel to take and defend depositions of the senior officers and managers of Murphy Oil Company. He worked with Mr. Martzell in developing the motion in limine to exclude the fault of the United States Army Corps of Engineers. Associates of his firm spent many hours working at the claims office.

Mr. Williams submitted 365 hours as time expended on this matter. 154 hours were submitted for his associate spent on this matter.

The Court therefore allocates a fee of $350,000 to Mr. Williams as fair and appropriate.

### Diane K. Zink

Ms. Zink was a member of the Proof of Claims Committee.

Ms. Zink worked at the claims office and advised class members of their rights and responsibilities. She assisted in getting the claims filed, and summarized 15 depositions and was present during some court hearings.

Ms. Zink submitted approximately 505 hours as time expended for the common benefit of the class. That time was well-described. The other time submitted is poorly documented and poorly described.

Ms. Zink worked at the claims office and did good work there. However, she was not in a leadership role in this position.

The Court, therefore, allocates a fee of $310,000 to Ms. Zink as fair and appropriate.

### Gregory P. DiLeo

Mr. DiLeo served on the Discovery Committee.

As a member of the Discovery Committee, Mr. DiLeo put together plaintiff deposition packets. These packets included information needed by the plaintiffs to be prepared for their depositions. He wrote all the instructions for the packets and, along with Jay Andry, met with clients to prepare them for their depositions. He tracked the depositions and coordinated the appearances of counsel. Mr. DiLeo also worked in the phone center answering calls from clients. He reviewed CD's of documents and coded the documents into a spread sheet.

Mr. DiLeo submitted 500 hours as time expended for the common benefit. Most of his time is well described.

Mr. DiLeo's work aided the common benefit, but he was not in a leadership position.

The Court therefore allocates a fee of $300,000 to Mr. DiLeo as fair and appropriate.

### Lance V. Licciardi

Mr. Licciardi was not assigned to any committee. He testified that he was contacted by the PSC and asked to contribute his clients to the class action. Mr. Licciardi contributed his cases to the critical mass. As a consequence, he relinquished his right to fees that would have been generated by his clients. He was a party to an agreement between himself and the Executive Committee that he would obtain a percentage of what his clients collected in settlement. Consequently, although Mr. Licciardi did little common benefit work, the Court allocates a fee of $260,000 to Mr. Licciardi as fair and appropriate and as compensation for the individual cases contributed to the class pursuant to the agreement he had with the Executive Committee.

### Dawn M. Barrios

Ms. Barrios participated as a member of the Settlement and Damages Committees.

Ms. Barrios was involved with experts Drs. Bianchini, Ginsberg, Giuvier, Greve, Kilpatrick, Mulhern, Penland, Shwery, Thrupe and Messrs. Krouse and Spiess.

Ms. Barrios worked on the preparation of the Master Complaint and toured the Murphy site with remediation experts. She researched and prepared pleadings regarding the defendant's contact with class members, and researched matters concerning the class certification case management order. Ms. Barrios worked with Mickey Landry to create maps of the contaminated areas and her work on the Damage Committee resulted in the identification of over 30 areas of potential damages. Ms. Barrios also researched the damage issues and did quantum work ups for those damages. She also coordinated efforts for a meeting of the class plaintiffs to prepare before their depositions. Ms. Barrios also worked with focus groups in various states.

Ms. Barrios submitted approximately 257 hours of time expended on this matter. Her time is well documented and all time appears to be for the common benefit. However, Ms. Barrios' work, although it contributed to the common benefit, was not as critical as the work contributed by other members of the PSC, in particular, the trial team.

The Court therefore allocates a fee of $258,000 to Ms. Barrios as fair and appropriate.

### Madro Bandaries

Mr. Bandaries was a member of the PSC and the Discovery Committee.

Mr. Bandaries gathered evidence for filing the initial suit and consulted with some original plaintiffs.

Mr. Bandaries submitted 927 hours of time as time expended for the common benefit. 497 hours are for Mr. Bandaries himself. It appears of the 927 total hours submitted, 597.5 hours are not for the common benefit. Of Mr. Bandaries' 497 hours, 193 hours are not for the common benefit.

Mr. Bandaries' work on the Discovery Committee was not extensive. Most of his work involved reviewing pleadings.

The Court therefore allocates a fee of $223,650 to Mr. Bandaries as fair and appropriate.

### J. Van Robichaux, Jr.

Mr. Robichaux had no committee assignments. He submitted 22.5 hours as work done for the common benefit through his Common Benefit Affidavit and a review of the hours shows that these hours were spent for the common benefit of the class. Based upon the review of his time records, the Court allocates a fee of $115,000 to Mr. Robichaux as fair and appropriate.

### Mark P. Glago

Mr. Glago had no committee assignments. Mr. Glago's work consisted of fact gathering, assisting in the preparation of the overall litigation strategy, and analysis of claims and research regarding discovery issues. Mr. Glago submitted only a summary time sheet that suggests that 465 hours of his time were expended for the common benefit. Although it is clear that Mr. Glago did some work for the common benefit, the failure to describe his work in the timesheets in accordance with the CMO, makes it difficult to determine the exact level of his participation. However, based upon, a review of the evidence, the Court allocates a fee of $112,750 to Mr. Glago as fair and appropriate.

### Rebecca A. Cunard

Ms. Cunard was co-chair of the Class Communications Committee.

Ms. Cunard worked on tasks assigned from Joseph Bruno, worked on proof of claims, and interviewed class members. She attended some court conferences and meetings.

Her time submitted as common benefit work is well-described. It appears that most of the work was for the common benefit, but Ms. Cunard did not act in a leadership role.

The Court therefore allocates a fee of $103,050 to Ms. Cunard as fair and appropriate.

### Benjamin D. Beychock

Mr. Beychock was a member of the Proof of Claims Committee. Mr. Beychock worked in the claims office and his work primarily consisted of working on a coding project for the Discovery Committee. Mr. Beychock's time entries revealed that much of his work consisted of reviewing emails and pleadings that were sent to other counsel. Mr. Beychock's timesheets revealed, however, that he billed for email review if the email related to something that was substantive. Mr. Beychock submitted 294.5 hours. 50 hours of time were recorded for review of emails and review of pleadings that are either not properly described or for work that was duplicative.

Mr. Beychock did not have a leadership role in this matter and the evidence reveals that some of his work was duplicative. However, he was a valuable member of the Proof of Claims Committee and worked many hours in the claims office.

The Court therefore allocates a fee of $100,950 to Mr. Beychock as fair and appropriate.

### William E. Bradley

Mr. Bradley was a member of the PSC. Mr. Bradley gathered evidence, participated in meetings of the PSC, researched legal issues, summarized depositions, monitored the litigation and submitted claims forms for his clients.

He has submitted 184.75 hours as hours worked for the common benefit.

The Court finds that Mr. Bradley did common benefit work, but he was not a major contributor to the litigation and his role was, primarily, not one of leadership.

The Court therefore allocates a fee of $100,500 to Mr. Bradley as fair and appropriate.

### Jessie L. Wimberly, IV

Mr. Wimberly was a member of the Trial Committee.

Mr. Wimberly met with the weather expert on meteorological issues and his participation also involved trial preparation matters. He organized discovery materials and prepared them for use at trial. Mr. Wimberly also helped to create exhibit lists and helped prepare exhibits for trial

Mr. Wimberly's time amounts to 335 hours. His time was not submitted to Bourgeois Bennett as per the Court's order. The Court, however, upon review of the evidence, finds that Mr. Wimberly's work did contribute to the common benefit.

The Court therefore allocates a fee of $100,000 to Mr. Wimberly as fair and appropriate.

### Walter C. Dumas

Mr. Dumas was a member of the Discovery Committee.

Mr. Dumas' common benefit work amounted to summarizing and attending several depositions and attending meetings and court conferences. The vast majority of the 560 hours of time submitted is for review of email and review of court documents.

Mr. Dumas did not have a leadership role in this case. Additionally, his involvement mainly involved reviewing work done by other counsel.

The Court therefore allocates a fee of $84,000 to Mr. Dumas as fair and appropriate.

### Bruce C. Betzer

Mr. Betzer held no committee assignments. Mr. Betzer submitted no time sheets for review by the Special Master or the Court, but his affidavit asserts that he worked 150 hours on behalf of his clients.

In view of his work that was documented, the Court allocates a fee of $67,500 to Mr. Betzer as fair and appropriate.

### Keith Couture

Mr. Couture had no committee assignments. Although Mr. Couture submitted no time sheets to the Court, he testified that he too entered into an agreement with the Executive Committee that would compensate him for the time worked on his individual cases that inured to the common benefit. Mr. Couture also testified that he was contacted by members of the PSC seeking his clients for the class and was told that he would be compensated on that basis. The Court finds that, indeed, Mr. Couture should be compensated on that basis.

The Court therefore allocates a fee of $60,000 to Mr. Couture as fair and appropriate.

### Jonathan B. Andry

Mr. Andry had no committee assignments.

Mr. Andry did not undertake any common benefit work and no time sheets were submitted. He testified in his deposition

that he too was contacted by members of the PSC and asked to contribute his clients to the class action. He testified that he was told his fees would come from a separate fund and he testified that this arrangement was approved by the Executive Committee.

The Court therefore allocates a fee of $50,000 to Mr. Andry as fair and appropriate.

### Michael G. Calogero

Mr. Calogero was a member of the Law Committee.

Mr. Calogero did legal research and wrote memoranda to the Law Committee on various issues regarding the Oil Pollution Act. He attended meetings and conferences, but research and writing was his primary focus.

No time sheets were submitted to the Special Master or to Bourgeois Bennett. Mr. Calogero states that 75 hours were expended for the common benefit, but these hours are not verifiable. However, a review of the other evidence submitted by Mr. Calogero reveals that his work was for the common benefit and that work amounted to approximately 75 hours.

The Court therefore allocates a fee of $47,500 to Mr. Calogero as fair and appropriate.

### Scott M. Galante

Mr. Galante was not assigned to a committee.

Mr. Galante submitted no time sheets to the Special Master, nor to Bourgeois Bennett. He submitted 68 hours as time spent for the common benefit. Although the Special Master finds that this time was primarily devoted to helping his own clients and not for the common benefit, some of the work did benefit the class.

The Court therefore allocates a fee of $47,500 to Mr. Galante as fair and appropriate.

### Ronald J. Favre

Mr. Favre had no committee assignments.

His submission was mainly for staff attorneys and paralegal hours at Mr. Hingle's office. Mr. Favre also submitted time in his affidavit. The work of the staff attorneys was mostly work done in the claims office.

The 166.25 hours for staff attorneys and for paralegals is claimed by Mr. Favre to be work for the common benefit. Mr. Favre was the supervising attorney, but his actual work for the common benefit was minimal.

The Court therefore allocates a fee of $45,000 to Mr. Favre as fair and appropriate.

### Jessie L. Wimberly, III

Mr. Wimberly had no committee assignments.

Mr. Wimberly worked on some discovery issues with the LADEQ and obtained some television coverage from the media. He prepared witnesses for depositions.

Mr. Wimberly submitted time sheets to the Special Master, but not to Bourgeois Bennett. In the time sheets, Mr. Wimberly claims 66 hours were expended for the common benefit.

The Court therefore allocates a fee of $40,000 to Mr. Wimberly as fair and appropriate.

### Stephen J. Herman

Mr. Herman had no committee assignments.

Mr. Herman provided overall litigation strategy, participated in fact gathering, analysis of claims and performed some legal research on class issues. His firm also provided capital contributions to the class.

Timesheets consisted of summary of the time spent for the common benefit. The

Herman firm submitted 75.75 hours as common benefit hours.

The Court therefore allocates a fee of $35,000 to Mr. Herman as fair and appropriate.

### Les A. Martin

Mr. Martin had no committee assignments. Mr. Martin submitted no timesheets to Bourgeois Bennett or the Court. However, the evidence submitted on his behalf reveals that he did work for the common benefit through his individual clients.

The Court therefore allocates a fee of $28,000 to Mr. Martin as fair and appropriate.

### Michael Hingle

Mr. Hingle had no committee assignments.

He bases his claim for common benefit fee on the basis of the advertising he did on television for the Murphy case. Mr. Hingle also claims to have signed up 200 clients for the Murphy case, but only 2 of those stayed in the class. He expended costs in buying television time.

The bulk of Mr. Hingle's 56.25 hours are for the review of pleadings and for attendance at hearings. The Court determines that Mr. Hingle's work was only minimally for the common benefit. No other counsel testified that either the Executive Committee or the PSC requested Mr. Hingle to buy television advertising time.

The Court therefore allocates a fee of $25,000 to Mr. Hingle as fair and appropriate.

### Lewis O. Unglesby

Mr. Unglesby had no committee assignments.

Mr. Unglesby submitted time sheets totaling 33.5 hours for the common benefit. These hours were never submitted to Bourgeois Bennett.

The Court determines that Mr. Unglesby's role in this litigation was minimal. Mr. Unglesby, himself, believes that the fee should benefit the attorneys that were affected by Hurricane Katrina.

The Court therefore allocates a fee of $15,000 to Mr. Unglesby as fair and appropriate.

### Shirin E. Harrell

Ms. Harrell had no committee assignments.

Ms. Harrell performed work only for her own clients and this work was not for the common benefit. Time sheets were not submitted to Bourgeois Bennett. She claims, however, that 21.7 hours of attorney time and 35.5 hours of paralegal time were for the common benefit.

The Court therefore allocates a fee of $15,000 to Ms. Harrell as fair and appropriate.

### Brent Coon

Mr. Coon submitted evidence that he had submitted time and cost expenses to the Bourgeois Bennett accounting firm. Mr. Coon's name, for reasons unknown and through no fault of his own, was not included on the list of counsel; consequently, he submitted no evidence to the Special Master. The exclusion of Mr. Coon from the list of counsel was the result of a clerical error. As a result, the Court has reviewed the evidence submitted and finds that his work contributed to the common benefit, in particular, the preparation of the matter for the class certification hearing, assistance in the preparation of discovery responses and work directed at Murphy Oil's motion to strike certain of the plaintiffs' experts.

The Court therefore allocates a fee of $8,277 to Brent Coon and Associates as fair and appropriate.

### Wiley J. Beevers

Mr. Beevers had no committee assignments.

Mr. Beevers submitted no time sheets.

At his deposition, Mr. Beevers waived any claim for common benefit fees.

The Court allocates no fee to Mr. Beevers.

### Sean D. Alfortish

Mr. Alfortish had no committee assignments.

Mr. Alfortish claims to have worked with Madro Bandaries on meeting with potential clients in St. Bernard Parish, including phone conversations and reviewed pleadings. None of this is common benefit work. None of his time is properly described.

The Court determines that no work was done for the common benefit and therefore the Court allocates no fee to Mr. Alfortish.

## III. SUMMARY AND CONCLUSION

For the reasons expressed above the common benefit fund shall be allocated in the following amounts to the following attorneys:

| Attorney | Fee Awarded |
| --- | --- |
| Sidney D. Torres, III | $4,257,000 |
| Joseph M. Bruno | $2,800,000 |
| Hugh P. "Skip" Lambert | $2,800,000 |
| Gerald E. Meunier | $2,800,000 |
| Scott R. Bickford | $2,200,000 |
| Ronnie G. Penton | $2,200,000 |
| Daniel E. Becnel, Jr. | $2,000,000 |
| Jerald N. "Jay" Andry, Jr. | $1,200,000 |
| Mickey P. Landry | $1,200,000 |
| Darleen M. Jacobs | $1,100,000 |
| Salvador E. Gutierrez, Jr. | $1,000,000 |
| Richard J. Arsenault | $1,000,000 |
| Robert M. Becnel | $ 700,000 |
| Anthony D. Irpino | $ 600,000 |
| Val P. Exnicios | $ 558,000 |
| E. Carroll Rogers | $ 550,000 |
| Walter J. Leger, Jr. | $ 400,000 |
| Michael G. Stag | $ 400,000 |
| Conrad S.P. Williams, III | $ 350,000 |
| Diane K. Zink | $ 310,000 |
| Gregory P. DiLeo | $ 300,000 |
| Lance V. Licciardi | $ 260,000 |
| Dawn M. Barrios | $ 258,000 |
| Madro Bandaries | $ 223,650 |
| J. Van Robichaux, Jr. | $ 115,000 |
| Mark P. Glago | $ 112,750 |
| Rebecca A. Cunard | $ 103,050 |
| Benjamin D. Beychock | $ 100,950 |
| William E. Bradley | $ 100,500 |
| Jessie L. Wimberly, IV | $ 100,000 |
| Walter C. Dumas | $ 84,000 |
| Bruce C. Betzer | $ 67,500 |
| Keith Couture | $ 60,000 |
| Jonathan B. Andry | $ 50,000 |
| Michael G. Calogero | $ 47,500 |
| Scott M. Galante | $ 47,500 |
| Ronald J. Favre | $ 45,000 |
| Jessie L. Wimberly, III | $ 40,000 |
| Stephen J. Herman | $ 35,000 |
| Les A. Martin | $ 28,000 |
| Michael Hingle | $ 25,000 |
| Shirin E. Harrell | $ 15,000 |
| Lewis O. Unglesby | $ 15,000 |
| Brent Coon | $ 8,277 |
| Wiley J. Beevers | $ 0 |
| Sean D. Alfortish | $ 0 |

As mentioned above, all counsel who invested costs for the common benefit of the class have already received their costs back plus 100% interest. The above allotment of fees is in addition to these sums. The process involved in determining the allotment of fees consumed considerable time. Additional common benefit costs may have been discovered or incurred. If there are any outstanding common benefit costs, appropriate motions to recover the same should be filed within ten days of this order. Finally, after all costs have been paid, if there are any additional funds in the registry of the Court as a result of interest accumulations, these funds will be distributed to all counsel on a pro rata basis. Likewise, if there are insufficient funds to pay any outstanding common benefit costs, the above allotments will be reduced on a pro rata basis. Payment of any fees or costs shall be stayed until completion of any appeals from this order.